# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

|  |  |  |
|---|---|---|
| **PATRICIA HOLLAND, the Surviving** | ) | |
| **Mother of KIP EUGENE HOLLAND** | ) | |
| **and WAYNE HOLLAND as the** | ) | |
| **Administrator of the Estate of** | ) | |
| **KIP EUGENE HOLLAND, Deceased** | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | **CIVIL ACTION FILE** |
| **VS.** | ) | |
|  | ) | **NO. 2:17-CV-0120** |
| **CYPRESS INSURANCE COMPANY;** | ) | |
| **JW HARPER FARMS, LLC,** | ) | |
| **and CHRISTOPHER A. RUNYUN,** | ) | |
| **as Administrator of the Estate of** | ) | |
| **JAMES WENDELL HARPER,** | ) | |
| **Deceased,** | ) | |
|  | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs, pursuant to LR 56.1(B)(2) for the Northern District of Georgia, submits their Response to Defendants' Statement of Material Undisputed Facts and her Statement of Additional Material Facts Presenting a Genuine Issue for Trial, as follows:

## I.   PLAINTIFFS' RESPONSE

1.   JW Harper Farms, LLC was not a legal entity subject to suit. (Doc. 8,

Second Defense, ¶ 19, 21-24).

**Response**:  Undisputed.  In further response, Plaintiffs note that Harper's truck included the aforementioned name stenciled on the side and multiple witnesses understood him to be incorporated.  Plaintiffs consent to the dismissal of this non-entity.

2.     Harper admits he individually was operating as an interstate motor carrier with the Cypress policy issued to him. (Doc. 8, ¶¶ 4, 8, 11).

**Response**:  Undisputed.

3.     Harper's June 30, 2017 Alabama Motor Vehicle Report for the previous three years show only a failure to obey a traffic control signal on February 11, 2016 Report. (Exhibit 9, MVR Report).

**Response**:  Disputed.  Defendants' Exhibit 9 also shows Harper's medical certification being secured by Dr. Johnston's FMCSA ME on August 1, 2016.  A certification now known to be obtained by way of fraudulent medical history information supplied by Harper.  (Exhibits 7 and 8) and Johnston Dep. at 22-23, 36, 40, 46, 49, 52, 53, 54-55, 61-63, 65, 67-68, 70, 71-72, 74, 80, 85-87, 92 and 115).

4.     Corporal Jonathan Spencer (J.S.) Munger of the Georgia State Patrol investigated this accident on  Georgia 369/Browns Bridge Road in  Gainesville,

Georgia on December 8, 2016. (Exhibit 1, excerpts from Munger depo., p. 8, 1. 3-10; p. 12, 1. 13-15; p. 13, 1. 25 - p. 14, 1. 2).

**Response**: Undisputed.

5.      Upon arrival, Munger observed paramedics placing Kip Holland into an ambulance. (Munger depo., p. 20, 1. 6-11).

**Response**: Undisputed.

6.      Munger did not interview James Harper at the accident scene; he spoke to him later that day at the hospital. (Munger depo., p. 21, 1. 20-25).

**Response**: Undisputed.

7.      At the hospital, Munger asked Harper simple questions due to Harper having a tracheostomy. (Munger depo., p. 22, 1. 9-16).

**Response**: Undisputed.

8.      Harper did not recall the accident; "He put his hands around his neck and acted as if he was coughing or choking." (Munger depo., p. 22, 1. 17-23; see also p. 24, l. 10-14).

**Response**: Plaintiffs' do not dispute Harper did not recall the collision and do not dispute the testimony of CPL Munger is as reflected above. Plaintiffs dispute any evidence exists beyond speculation as to Harper's condition or activities prior to him killing Kip Holland. Plaintiffs object to any presentation of Harper's hand and

arm signal to indicate a coughing or choking event occurred as being speculation.

9.      Munger does not know how long Harper was coughing/choking leading up to the accident. (Munger depo., p. 24, 1. 15- 17; p. 27, 1. 16 - p. 28, 1. 7).

**Response**:  Undisputed.  However, Plaintiffs dispute any evidence exists beyond speculation as to Harper's condition or activities prior to him killing Kip Holland.

10.     Munger used the phrase "just before" the incident in his affidavit, and he used it in a manner consistent with meaning "a few seconds or seconds before" or "immediately before." (Munger depo., p. 60, 1. 25 - p. 61, 1. 18).

**Response**:  Disputed.  Munger also testified "I can't sit here and say, you know, whether it be two minutes, two miles, or you know, ten seconds.  I don't know." He could not provide a more accurate time frame.  (Munger Dep. at 28, l. 8-18)

11.     Furthermore and in light of Plaintiff 's counsel showing Munger multiple places on Browns Bridge Road where a vehicle could stop or pull over, Munger has no knowledge if Harper was having any breathing difficulties or choking symptoms at any points of the road leading up to the accident scene. (Munger depo., p. 59, 1. 2 - p. 60, 1. 24)

**Response**: Undisputed.  No witnesses know if Harper was having such issues leading up to the death of Kip Holland.

12.     Munger  learned  from  a  witness,  Kristin  Fuller,  who  found  Harper

passed out or slumped over into the passenger seat of his truck, but he doesn't know at what point Harper passed out during the accident sequence. (Munger depo., p. 29, 1. 4-16; p. 31, 1. 17-22).

**Response**: Undisputed.  No witnesses know if Harper passed out at any time leading up to the death of Kip Holland.

13.    Munger found no evidence in his investigation that Harper did not pass out or lose consciousness. (Munger depo., p. 29, 1. 21-23).

**Response**: Undisputed.  In further response, no evidence has been found indicating Harper did pass out or lose consciousness prior to killing Kip Holland.

14.    Munger confirmed the damage pattern to the vehicles in the parking lot at Mincey Marble and Harper's tractor was consistent with Harper's tractor coasting into the parking lot per witness Fuller's statement. (Munger depo. p. 32, 1. 4-19).

**Response**: Disputed.  Fuller stated in her deposition that Harper's truck appeared to be traveling faster than coasting.  (Howard Dep. at 12, l.7.)

15.    Munger confirmed he never spoke to nor was contacted by witness Scott Carpenter. (Munger depo., p. 33, 1. 12 - p. 34, 1. 4).

**Response**: Undisputed.

16.    Kristen Fuller (now Howard) worked at Mincey Marble in Gainesville,

Georgia on December 8, 2016. (Exhibit 2, excerpts from Howard depo., p. 10, 1. 10-15).

**Response**: Undisputed.

17. She did not see Harper's tractor trailer turn over, but first saw Harper's tractor coming into the Mincey Marble parking lot. (Howard depo., p. 11, 1. 1-12).

**Response**: Undisputed.

18. Howard did not hear the tractor accelerating into the parking lot. (Howard depo., p. 12, 1. 2-4).

**Response**: Undisputed.

19. At deposition, Howard claimed Harper's tractor was going a little faster than coasting but could not give a speed estimate. (Howard depo., p. 12, 1. 5-10).

**Response**: Undisputed.

20. However, Howard confirmed speaking to the investigating officer at the scene. (Howard depo., p. 30, 1. 6-15).

**Response**: Undisputed.

21. After reviewing the police report prepared by Officer Munger, Howard confirmed she told the officer Harper's tractor coasted into the parking lot.

(Howard deed., p. 31, l. 10 - p. 32, l. 5).

**Response**: Disputed.  Howard said she could not remember.  (Howard Dep. at 31, l. 25 through 32, l. 2)

22.    Howard went to Harper's tractor after it stopped, climbed up along the passenger side door and saw Harper slumped over in the cab. (Howard depo., p. 13, l. 4-17).

**Response**: Undisputed.

23.    Harper was slumped over toward the passenger seat and was not moving. (Howard depo., p. 14, l. 3-4).

**Response**: Undisputed.

24.    Howard remembered other Mincey employees trying to wake up Harper and sit him up because they did not know if Harper was breathing; she also noticed a gash on his head which was bleeding. (Howard depo., p. 16, l. 6-18)

**Response**: Undisputed.

25.    Harper made some eye movements but was never conscious until after the ambulance arrived.  (Howard depo., p. 16, l. 19-24).

**Response**: Undisputed.

26.    Scott Carpenter drives Browns Bridge Road near Mincey Marble  about

once a month. (Exhibit 3, excerpts from Carpenter depo., p. 24, 1. 12 - p. 25, 1. 9).

**Response**: Undisputed.

27.    On the day of the accident, Carpenter was driving back from mountain biking in his 2011 Ford F-150. (Carpenter depo., p. 25, 1. 10-20).

**Response**: Undisputed.

28.    He had been driving approximately 15 minutes prior to the accident. (Carpenter depo., p. 28, 1. 4-7).

**Response**: Undisputed.

29.    Carpenter recalled passing through the intersection of Browns Bridge Road/Georgia Highway 369 and Georgia Highway 53 when he first noticed Harper's tractor trailer two vehicles in front of him. (Carpenter depo., p. 29, 1. 5-22).

**Response**: Undisputed.

30.    Carpenter could not recall any details about these two other vehicles in between him and Harper's trailer other than they were not tractor-trailers. (Carpenter depo., p. 29, 1. 23 - p. 31, 1. 7).

**Response**: Undisputed.

31.    Harper's tractor-trailer was about 30 to 40 yards ahead of him. (Carpenter

depo., p. 33, l. 14-16).

**Response**:  Undisputed.

32.    As they drove on Browns Bridge Road, this distance increased to where Harper was about 50 to 100 yards ahead of Carpenter. (Carpenter depo., p. 36, l. 23 - p. 37, l. 17).

**Response**:  Undisputed.

33.    Carpenter remembered seeing a pickup truck veer off the road and he realized Harper's tractor-trailer went left of center. (Carpenter depo., p. 32, l. 19 - p. 33, l. 1).

**Response**:  Undisputed.

34.    Carpenter could not recall what tires of Harper's tractor-trailer he saw cross the center line. (Carpenter depo., p. 34, l. 22 - p. 35, l. 24).

**Response**:  Disputed.  Carpenter testified that he believed he recalled the last set of four tires crossing the center line.  (Carpenter Dep. at 34, l. 25 through 35, l. 1). He goes on to say "I remember that the trailer tires crossed the center line." (Id. at 35, l. 20-21).

35.    Carpenter did not recall any other on-coming vehicles pass him or swerve off the road.   (Carpenter depo., p. 37, l. 18 - p. 38, l. 1).

**Response**:  Undisputed.  However, Carpenter also recalled Harper's continued

erratic driving and inability to maintain a straight line throughout the two-mile

spans of Hwy 369 between the Hwy 53 intersection and the location in which

Harper killed Kip Holland.  (Carpenter Dep. at 34 l.3 and 38 l.20-25 and Aff. at

¶4.)

36.    Carpenter  claims  Harper  was  "not driving  in  a perfectly straight

line."  (Carpenter depo., p. 38, l. 16- 25).

**Response**:  Undisputed.

37.    He denied ever seeing Harper's tractor-trailer ever cross   the   center

line   again   before   the   accident. (Carpenter depo., p. 40, l. 3-9).

**Response**:  Undisputed provided the fact is read in conjunction with response to

statement 34, above.  Furthermore, Carpenter also recalled Harper's continued

erratic driving and inability to maintain a straight line throughout the two-mile

spans of Hwy 369 between the Hwy 53 intersection and the location in which

Harper killed Kip Holland.  (Carpenter Dep. at 34 l.3 and 38 l.20-25 and Aff. at

¶4.)

38.    He furthermore had  no  recollection  of  Harper  leaving his  lane  of  travel

any  other  times  until  the  accident occurred. (Carpenter depo., p. 40, l. 10-17).

**Response**:  Undisputed.  However, Carpenter also recalled Harper's continued

erratic driving and inability to maintain a straight line throughout the two-mile

spans of Hwy 369 between the Hwy 53 intersection and the location in which Harper killed Kip Holland. (Carpenter Dep. at 34 l.3 and 38 l.20-25 and Aff. at ¶4.)

39. Carpenter was not able to see Harper inside his tractor prior to or during the accident. (Carpenter depo. p. 40, 1. 21 - p. 41, 1. 1; p. 42, 1. 4 - 14).

**Response**: Undisputed.

40. Carpenter has no knowledge if Harper was conscious at the time of the movements of the tractor-trailer during the accident. (Carpenter depo., p. 42, 1. 15-17).

**Response**: Undisputed. In further response, no witness has any knowledge as to whether Harper was conscious at the time of the movements of the tractor-trailer during the collision.

41. Carpenter confirmed his voice on his 911 call during which he described the driver of the tractor-trailer may have been having a medical emergency. (Carpenter depo., p. 45, 1. 5 - p. 46, l. 20).

**Response**: Undisputed.

42. Carpenter stopped at the scene to offer assistance, but someone was already inside Harper's tractor, so Carpenter did not render any further assistance afterwards. (Carpenter depo., p. 47, 1. 10-18).

**Response**:  Undisputed.

43.     Carpenter left the scene before any law enforcement personnel arrived. (Carpenter depo., p. 49, 1. 23 - p. 50, l. 5).

**Response**:  Undisputed.

44.     He estimated he stayed at the scene for no more than three or four minutes. (Carpenter depo., p. 51, 1. 17-22).

**Response**:  Undisputed.

45.     Stanley Harper, brother of James Harper, deceased, was not aware of Harper ever passing out or blacking out suddenly before the accident. (Exhibit 4, excerpts from Stanley Harper depo., p. 9, 1. 10-15).

**Response**:  Undisputed.  In further response, no evidence exists Harper passed out or blacked out prior to killing Kip Holland.

46.     Judith Harper is the wife of Stanley Harper, the brother of James Harper, deceased (Exhibit 5, excerpts from Judith Harper depo., p. 5, 1. 21-24).

**Response**:  Undisputed.

47.     After overcoming cancer in 2012, she thought James Harper was doing really well health-wise. (Judith Harper depo., p. 23, 1. 12-20).

**Response**:  Disputed.  Mrs. Harper also stated no person ever discussed Harper's medical condition with her between 2012 and December of 2016.  (Judith Harper

Dep. at 23, l. 5-11).  Additionally, questions of fact arise regarding Harper's health
when reviewing Mr. Harper's medical records after his 2012 cancer diagnosis.

48.    She denied recalling any episode of James Harper coughing very
severely and coughing up gravy or anything similar. (Judith Harper depo., p. 24, l.
6-12)

**Response**:  Undisputed as to the content of Ms. Harper's stated testimony.  In
further response, it was Harper's daughter, Ms. Bell, who spent the most time with
him of all family members and recalled Harper's uncontrollable coughing and
coughing up gravy at the breakfast table.  (Bell Dep. at 83, l. 22 – 84, l. 8).

49.    She denied ever seeing or knowing about James Harper passing out or
blacking out suddenly before the accident. (Judith Harper depo., p. 31, l. 18 - p.
32, l. 2).

**Response**:  Undisputed.  In further response, no evidence exists Harper passed out
or blacked out prior to killing Kip Holland.

50.    Dennis Myers is the step-son of James Harper, deceased.  (Exhibit 6,
excerpts from Dennis Myers depo., p. 5, l. 15-24).

**Response**:  Undisputed.

51.    Myers is a patrolman for the Guntersville  (Alabama) Police Department
and has worked there for approximately 25 years. (Myers depo., p. 6, l. 3-13).

**Response**: Undisputed.

52.     Myers recalled times where James Harper would have to clear his tracheostomy of phlegm or drainage from time to time and would have to eat slowly, but denied seeing a "coughing fit." (Myers depo. p. 17, l. 3-25).

**Response**: Disputed. Mr. Myers also deferred to Ms. Bell as "she spent more time with him" regarding instances in which Harper coughed up something at the table. (Myers Dep. at 17, l. 19-20). It was Harper's daughter, Ms. Bell, who spent the most time with him of all family members and recalled Harper's uncontrollable coughing and coughing up gravy at the breakfast table. (Bell Dep. at 83, l. 22 – 84, l. 8). Myers also recalled Harper having to "cough up phlegm that a normal person would probably be able to swallow." (Myers Dep. at 17, l. 19-25).

53.     Myers never knew James Harper to suddenly blackout or to suddenly and unexpectedly pass out. (Myers depo. p. 22, l. 22 - p. 23, l. 3).

**Response**: Undisputed. In further response, no evidence exists Harper passed out or blacked out prior to killing Kip Holland.

54.     Cynthia Annette Bell is the daughter of James Harper, deceased. (Exhibit 7, excerpts from Cynthia Bell depo., p. 10, l. 10-13).

**Response**: Undisputed.

55.     Bell recalled after the accident, James Harper's nurse and doctor believed

James Harper may have had a coughing spell and passed out from it at the time of the accident. (Bell depo., p. 45, l. 3-13).

**Response**: Disputed.  Plaintiffs object to Bell's testimony as it is not supported by any medical record of Harper, and is thus, inadmissible hearsay rendering it non-factual.

56.     Bell frequently went with James Harper to his doctor's visits with Dr. James Milligan.   (Bell depo., p. 56, l. 13- 18; p. 60, l. 17-21).

**Response**: Undisputed.

57.     To her recollection, the discussions centered on keeping James Harper's medications filled and some problems with his shoulder.  (Bell depo. p. 60, 1. 2 2 - p. 61, 1. 3).

**Response**: Disputed.  Bell's testimony stated the issues discussed were about "[m]ostly just keeping his mediation filled for his wheezing, his inhalers, that's basically all it was.  He had a shoulder that he had some problems with once in a while.  Other than that, he didn't."  (Bell Dep. at 60, 1. 22 - 61, 1. 3).  Furthermore, Harper's actual medical records for the time leading up to December 8, 2016 are inclusive of many other conditions.  (Doc. 88-1).

58.     James Harper regularly took his nebulizer/breathing treatments to assist with opening up his lungs to assist his breathing, and would carry this with him when

driving. (Be11 depo. p. 81, 1. 20 - p. 83, 1. 6; p. 92, 1. 1 - p.93, 1. 12).

**Response**:  Undisputed.  However, Ms. Bell did not know if Harper took a breathing treatment while his truck was being loaded on December 8, 2016, but did recall Harper coughing to the extent he could not talk to his wife for very long. She went on to characterize his coughing as "uncontrollable for a minute."  (Bell Dep. at 83, l. 22 – 84, l. 8).

59.     Bell admitted James Harper had coughing spells during which he would using his breathing treatments. (Bell depo. p. 83, 1. 20 - p. 84, 1. 8).

**Response**:  Undisputed.  However, Ms. Bell did not know if Harper took a breathing treatment while his truck was being loaded on December 8, 2016, but did recall Harper coughing to the extent he could not talk to his wife for very long. She went on to characterize his coughing as "uncontrollable for a minute."  (Bell Dep. at 83, l. 22 – 84, l. 8).

60.     Bell denied ever being aware of James Harper passing out or blacking out while driving. (Bell depo. p. 96, 1. 22 - p. 97, 1. 3).

**Response**:  Undisputed.  However, Ms. Bell did not know if Harper took a breathing treatment while his truck was being loaded on December 8, 2016, but did recall Harper coughing to the extent he could not talk to his wife for very long. She went on to characterize his coughing as "uncontrollable for a minute."  (Bell

Dep. at 83, l. 22 – 84, l. 8).  <u>See also</u> Defendants' statement at 61, below.

61.    Bell recalled Harper coughing when sick and "kind of lose, things that kind of goes around and around for a minute … kind of black out and have to stagger somewhat ... [but] he wouldn't driving when he was like that." (Bell depo. p. 97, 1. 4-25).

**Response**:  Undisputed.

62.    Dr. Milligan never told James Harper not to drive or to stop driving at any time between throat cancer until this accident. (Bell depo., p. 98, 1. 8-11; p. 9 9, 1. 18-2 3; p. 100, 1. 8-10).

**Response**:  Undisputed.  However, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

63.    James W. Harper was one of Dr. Joel Milligan 's patients. (Milligan aff. ¶ 3).

**Response**:  Undisputed.  However, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

64.    Dr. Milligan was aware Harper was a commercial motor vehicle operator. (Milligan aff. ¶ 4).

**Response**:  Undisputed.  However, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

65.    Dr. Milligan understands Harper was involved in a motor vehicle accident in

early December 2016. (Milligan aff., ¶ 5).

**Response**: Undisputed.  However, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

66.     Harper had chronic obstructive pulmonary disease (COPD) which was controlled through various medications and breathing treatments. (Milligan aff., 9).

**Response**: Disputed.  Plaintiffs do not dispute Harper had COPD and consumed various medications and breathing treatments.  Given Harper's medical history, coupled with the aforementioned testimony of Ms. Bell and others, Plaintiffs dispute whether Harper's COPD was "controlled." (Bell Dep. at 83, l. 22 – 84, l. 8 and 97 l. 22 – 98 l. 1), Docs. 88-1 and Exhibit 9.

67.     During his treatment of Mr. Harper, he did not have a history of chronic hypoxemia at rest (abnormally low level of oxygen in the blood), chronic respiratory failure, or a history of continuing cough with cough syncope (temporary loss of consciousness upon coughing). (Milligan aff., ¶ 10)

**Response**: Disputed.  (Bell Dep. at 83, l. 22 – 84, l. 8, 87, l. 21 - 88, l. 5, 97 l. 22 – 98 l. 1 and Doc 88-1).  Additionally, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

68.     Mr. Harper did not have a history of blacking out or passing out, narcolepsy (characterized by overwhelming daytime drowsiness with sudden attacks of sleep),

or obstructive sleep apnea (sleep disorder causing breathing to stop and start during sleep). (Milligan aff., ¶ 11).

**Response**:  Disputed as to blacking out or passing out and sleep apnea.  Bell Dep. at 87, l. 21 – 88, l. 5 and 97, l. 22 – 98, l. 1 and Exhibit 9).  Additionally, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as a defense expert.

69.    Nothing in Dr. Milligan's treatment records of Mr. Harper indicates that he was at any increased risk of passing out or losing consciousness while driving. (Milligan aff., ¶ 12).

**Response**:  Disputed.  Despite the fact no evidence exists Harper passed out or lost consciousness while driving before killing Kip Holland, when considering the aforementioned testimony of Ms. Bell and others, Dr. Milligan's records include diagnoses that could place him at increased risk of passing out or losing consciousness from uncontrolled coughing.  Such conditions include: COPD, a recognition of hydrocodone usage inaccurately characterized as "sparingly," swallowing problems, worsening of shortness of breath, productive cough, an inaccurate description of Harper's status as a "former" smoker, issues with his tracheostomy, and hospitalizations for pneumonia.  (Doc. 88-1).  Additionally, Plaintiffs have not been permitted to depose Dr. Milligan since being designated as

a defense expert.

70.    Dr. Milligan never told Mr. Harper that he should not drive because he was

likely to pass out or lose consciousness while driving. (Milligan aff., ¶ 13).

**Response**:  Undisputed.  Additionally, Plaintiffs have not been permitted to depose

Dr. Milligan since being designated as a defense expert.

71.    Dr. Milligan was not aware of any medical condition for which he treated

Mr. Harper that would automatically disqualify him from being a commercial

motor vehicle operator. (Milligan aff., ¶ 14).

**Response**:  Undisputed.  In further response, Dr. Milligan is admittedly not a

current FMCSA ME and has not been one since 2010.  (Milligan Aff. at ¶ 6).

Given Harper's fraudulent medical history as reported to Dr. Johnston a disputed

fact likely arises as to what knowledge Dr. Milligan had about Harper's medical

history.  Additionally, Plaintiffs have not been permitted to depose Dr. Milligan

since being designated as a defense expert.


## II.    PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS PRESENTING A GENUINE ISSUE FOR TRIAL

1.    Defendants' Decedent James W. Harper (hereinafter "Harper") ran off of the

road in his tractor-trailer and killed pedestrian Kip Holland – Plaintiffs' Decedent

(hereinafter "Kip") on December 8, 2016.  (Mincey Marble Security Video of

Collision, December 8, 2016, attached as Exhibit 1).

2.      Kip Holland's body was "quite compressed into the ground" as a result of the tractor trailer crushing him.  (Exhibit 1 and McArthur Dep. at 15).

3.      Kip Holland was rushed to the hospital and found to be "in traumatic arrest and unresponsive" with "multiple rib fragments in the chest."  (Holland Record of Northeast Georgia Medical Center ("NEGMC") attached as Exhibit 2)

4.      Kip Holland "had no measurable blood pressure or pulse."  (Exhibit 2)

5.      He was found to have a cardiac laceration, never regained any pulse, and his "time of death was noted . . .."  (Holland Record of NEGMC attached as Exhibit 3).

6.      Kip's family had not yet reached the hospital.  (Exhibit 3).

7.      Kip's cause of death was determined to be "generalized trauma."  (Holland Death Certificate attached as Exhibit 4).

8.      On December 8, 2016, Harper's loaded truck weighed over 78,000 lbs.  (Bill of Lading attached as Exhibit 5 and Glasgow Dep. at 62).

9.      When fully loaded, up to 80,000 lbs. would be permissible.  (Johnston Dep. at 17 and Glasgow Dep. at 60).

10.      For the period of time covering December 8, 2016, Harper was driving with authorization based in part on the requisite Federal Motor Carrier Safety

Administration ("FMCSA") Medical Examination ("ME") secured on August 1, 2016 and conducted by Larry Johnston, M.D.  (ME Records of Larry Johnston, M.D., attached collectively as Exhibit 6 and Johnston, Dep. at 20).

11.     As a portion of his FMCSA ME, Harper was required to complete a self-reporting medical history questionnaire.  (Exhibit 6 at Bates 218)

12.     The questionnaire consisted of 32 separate questions asking the driver, "[d]o you have or have you ever had:" various conditions.  (Exhibit 6)

13.     Of the 32 questions, Harper's responses to 12 of them were wholly inconsistent with his medical history.  (Exhibit 7 and Johnston Dep. at pages 22-23, 36, 40, 46, 49, 52, 53, 54-55, 61-63, 67-68, 70, 71-73, 74, 80, 85-87, 92, 115).

14.     Such inaccurate responses included multiple questions related to a current or past history of respiratory conditions, lung disease, cancer, and chronic diseases to which Harper responded in the negative.  (Exhibit 7).

15.     Harper also inaccurately denied the use of any medications.  (Exhibit 6 at Bates 216, Johnston Dep. at 96 and Exhibit 8).

16.     The highlighted responses of the ME History Questionnaire at Exhibits 7 and 8 are responses provided by Harper reflecting negative responses Harper's medical history indicates should have been affirmative responses. (Exhibits 7 and 8 and, Johnston Dep. at 22-23, 36, 40, 46, 49, 52, 53, 54-55, 61-63, 67-68, 70, 71-73,

74, 80, 85-87, 92, 115)

17.    The years and months leading up to December 8, 2016 were replete with instances of health problems including and diagnoses from multiple providers. (Doc 88-1).

18.    Harper was known to family members to have a history of respiratory conditions requiring breathing treatments.  (Bell Dep. at 83).

19.    If Harper felt like he might be short of breath, he would take a breathing treatment to include times when he waited on his truck to be loaded.  (Bell Dep. at 83).

20.    Ms. Bell, Harper's daughter, described Harper's coughing as "uncontrollable," adding that she recalled him coughing to the extent the family breakfast "would have gravy all over the table . . .."  (Bell Dep. at 83-84)

21.    In November 2016, just one month prior to Kip Holland being killed, Harper was having a lot of congestion, and eating dairy caused him to "wake up in the morning all choked up."  (Bell Dep. at 65 and 94).

22.    On November 7, 2016, Harper reported to Marshall Medical Center Hospital with breathing difficulties to ultimately be diagnosed with "acute exacerbation of COPD."  (Exhibit 9).

23.    Chronic obstructive pulmonary disease ("COPD") is "more or less

emphysema."  (Johnston Dep. at 70).

24.      COPD is a condition from which Harper had suffered for a number of years.  (Doc. 88-1, e. g. Pages 55 and 67 of 102).

25.      COPD can produce shortness of breath, wheezing, and a chronic cough. (Johnston Dep. at 88).

26.      COPD is "characterized by chronic reduction in maximal expiratory flow." (Johnston Dep. at 89)

27.      COPD sufferers "can't breathe out as well as a normal subject." (Johnston Dep. at 89).

28.      Reported symptoms are "chronic cough, sputum production, dyspnea on exertion."  (Johnston Dep. at 89).

29.      Dyspnea is shortness of breath.  (Johnston Dep. at 81).

30.      As the disease progresses, the symptoms may become incapacitating. (Johnston Dep. at 89).

31.      Ms. Bell also has COPD.  (Bell Dep. at 81).

32.      When describing an acute COPD exacerbation, Ms. Bell stated: "you just feel like you can't breathe, you can't take a deep breath because your lungs are bad."  (Bell Dep. at 82).

33.      COPD is why Harper took four breathing treatments a day.  (Bell Dep. at

82).

34.     Harper took the breathing treatments from a machine he carried in his truck and often while his truck was being loaded.  (Bell Dep. at 82-83).

35.     Harper was a smoker for many decades.  (Exhibit 10 at Bates 160).

36.     Harper had a history of cancer and a resulting tracheostomy.  (Exhibit 11 at Bates 183).

37.     Harper was on breathing treatments and medications.  (Exhibit 12).

38.     At the time of his ME, Harper was on Hydrocodone (4x/day), Symbicort (2x/day), Albuterol inhaler (3x/day), Buproprion, Metroprolol, and Levofloxacin. (Exhibit 12).

39.     Taking medications was another false denial of Harper at the time of his FMCSA ME.  (Exhibit 7).

40.     In December 2016, Harper remained on Hydrocodone, Symbicort, Albuterol, Metroprolol, Bupropion, and Chantix.  (Exhibit 12).

41.     Symbicort and Albuterol are both breathing treatments.  (Johnston Dep. at 98 and 104, respectively).

42.     Chantix made Harper very tired.  (Exhibit 13 at Bates 1749.).

43.     On December 8, 2016, Harper secured a load of chicken feed in Gainesville, Georgia. (Exhibit 5).

44.     Just before his departure, as he waited for his trailer to be filled, Harper called his wife and daughter, speaking with his wife, first.  (Bell Dep. at 83-84).

45.     During the conversation, he suffered from a coughing spell with such severity, he was unable to talk with his daughter.  (Bell Dep. at 83-84).

46.     Alone in his truck, Harper's route eventually placed him on Georgia Highway 369.  (Exhibit 14).

47.     Just as Harper crossed the intersection of Highway 369 and Georgia Highway 53 traveling westbound, another motorist, Scott Carpenter, noticed Harper's tractor trailer.  (Exhibit 15 at ¶ 4).

48.     Mr. Carpenter was behind Harper traveling in the same direction.  (Exhibit 15 at ¶ 4).

49.     Mr. Carpenter observed Harper traveling in a concerning manner.  (Exhibit 15 at ¶ 4).

50.     Mr. Carpenter noticed Harper's tractor trailer nearly force another motorist, traveling in the opposite direction, off of the road.  (Carpenter Dep. at 31).

51.     It appeared Harper's tractor trailer was having great difficulty maintaining its lane of travel, was not driving in a perfectly straight line, and it was swerving in the roadway in front of Mr. Carpenter.  (Carpenter Dep. at 36-38 and Exhibit 15 at ¶ 4).

52.     For the two miles that followed, between the intersection of Highways 369 and 53 and the location of Kip Holland's death, Mr. Carpenter saw Harper continue to drive erratically and wondered if he should call 911. (Carpenter Dep. at 34).

53.     After Harper caused the oncoming vehicle to swerve, he noticed Harper seeming to still have difficulty after that.  (Carpenter Dep. at 38).

54.     Carpenter was concerned Harper would either leave the roadway altogether or collide with other vehicles or objects near it.  (Exhibit 15 at ¶5).

55.     Had Harper traveled the two mile distance recalled by Mr. Carpenter at the 45 miles per hour speed limit for that stretch of road, Harper's erratic driving took place over a time period of at least two (2) minutes and forty (40) seconds. (Munger Dep. at 54-57).

56.     Had Mr. Harper traveled below the speed limit, such time of erratic driving would have been even longer.  (Munger Dep. at 57).

57.     Harper's travels over that same stretch of road included no less than six (6) locations where Mr. Harper could have safely pulled his tractor trailer off of Highway 369 before he killed Kip Holland.  (Munger Dep. at 42, 4, 47, 49, 51, 53 and Exhibit 16).

58.     At the time Harper was traveling in front of Scott Carpenter on Highway

369, Kip Holland was walking against the flow of traffic on the shoulder of

Highway 369 in an eastbound direction.  (Exhibits 1 and 14).

59.     Just as Kip Holland's walk reached the portion of Highway 369 that passes

in front of the business Mincey Marble ("MM"), Harper ran off of the side of the

pavement. (Exhibits 1 and 14).

60.     Harper's tractor and trailer slid sideways, the trailer struck Kip Holland, and

Kip Holland was crushed and killed. (Exhibits 1 and 14).

61.     Bystanders on a smoke break from MM, noticed Harper's tractor enter the

MM parking lot and strike parked vehicles.  (Howard Dep. at 11).

62.     Some bystanders responded to Harper's tractor and found him

unresponsive in the vehicle.  (Howard Dep. at 15-16).

63.     No such bystanders, or any other witness, have any knowledge of what

took place inside Harper's tractor-trailer, to include his condition, prior to arriving

at his stopped tractor trailer cab to render assistance.  (Howard Dep. at 10, 12, and

21).

64.     With the exception of Scott Carpenter, no known witnesses saw Harper's

conduct at all prior to his tractor trailer coming to a halt following the striking of

MM parked vehicles.

65.     Harper did not speak to any of the bystanders at the scene.  (Howard Dep.

at 16).

66.    Harper was taken to NEGMC by way of an ambulance from the scene.
(Exhibit 17 at Bates No. 03274).

67.    Harper's urine was tested in conjunction with his treatment.  (Exhibit 18 at
Bates no. 2199).

68.    Harper's urine test rendered positive results for opioids.  (Exhibit 18 at
Bates no. 2199).

69.    Harper never underwent FMCSA drug testing even after he began to
recover in the hospital.

70.    Trooper Munger of the GSP visited Harper at the hospital.  (Munger Dep.
at 21).

71.    Upon inquiry by Trooper Munger, Harper could not recall what had
happened in the crash, but placed his hands on his neck and provided Trooper
Munger the symbol for choking.  (Munger Dep. at 22).

72.    Trooper Munger then assumed Harper had choked prior to the crash, but
does not know whether the alleged choking, to the extent it contributed to this
collision, occurred for "two minutes, two miles, or . . . ten seconds . . ."  prior to
Harper killing Kip Holland.  (Munger Dep. at 28).

73.    Trooper Munger was "trying to get how long [Harper] had been . . choking

and coughing . . . [b]ut [he] couldn't get that."  (Munger Dep. at 28).

74.     Harper's daughter, Cynthia "Annette" Bell stayed with Harper during his hospitalization at NEGMC following the incident.  (Bell Dep. at 41-42).

75.     According to Bell, there were several days following this collision in which Harper did not speak at all.  (Bell Dep. at 44).

76.     Thereafter, Harper remembered nothing about the crash.  (Bell Dep. at 29-30).

77.      In contrast to the choking signal provided by Harper to Trooper Munger, Harper told his daughter that he could not even remember loading at Cargill prior to his departure that day.  (Bell Dep. at 29).

78.     For some time, he had no knowledge Kip Holland had been killed.  (Bell Dep. at 30-31).

79.     Harper told a multitude of persons with whom he had a relationship that he could not recall the crash at all.  (Bell Dep. at 29-30, 47 and Judith Harper Dep. at 31).

80.     On July 31, 2017, Harper died.  (Doc 17).

81.     In a letter dated December 14, 2016, Plaintiffs' counsel wrote to Harper demanding various evidentiary items be preserved.  (Exhibit 19).

82.     On December 16, 2013, Plaintiffs' counsel made the same demand on

Cypress Insurance and Defense counsel.  (Exhibit 20).

83.    Among such items demanded for preservation was Harper's FMCSA

mandated log book.   (Exhibits 19 and 20).

84.    The day prior to Harper's departure from Northeast Georgia Medical Center,

he expressed the desire to get his belongings out of his truck.  (Bell Dep. at 70).

85.    To comply with Harper's desires, Harper's truck was cleaned out by Annette

Bell's daughter, Keri.  (Bell Dep. at 70).

86.    Bell then assisted Keri to unload the car with the items they removed from

Harper's truck.  (Bell Dep. at 75).

87.    Bell then separated some items between a storage building and Harper's

house.  (Bell Dep. at 75-76).

88.    Thereafter, Harper and his daughter "went through all the stuff we brought

in the house and [Harper] said throw it away or save it . . ." directing Bell as to

what items he wished to retain and that which he wished to discard.  (Bell Dep. at

76).

89.    Harper took saved items with him to Stan and Judy Harper's house.  (Bell

Dep. at 76, Judith Harper Dep. at 12-13 and Stanley Harper Dep. at 8).

90.    Harper's mandatory FMCSA log book was not retained.

91.    On June 8, 2017, Plaintiff filed the case at bar.  (Doc. 1).

92.     In an email dated June 29, 2017 and a letter of August 4, 2017, as well as numerous telephone conversations in between, Plaintiff's counsel requested the deposition of Harper.  (Exhibit 21 and Exhibit 22).

93.     Harper was never permitted to testify by deposition.

94.     No evidence exists that on December 8, 2016 Harper ever "passed out" or "blacked out" prior to striking and killing Kip Holland.

95.     Other than the choking symbol provided to Trooper Munger by Mr. Harper, and the erratic driving for no less than two minutes and forty seconds witnessed by Scott Carpenter, no evidence exists of any medical emergency experienced by Harper at all.

**LAZENBY LAW GROUP, LLC**

*/S/ R. SHANE LAZENBY*

_____
R. SHANE LAZENBY
GEORGIA STATE BAR NUMBER 441670

P.O. BOX 2875
GAINESVILLE, GEORGIA 30503
678-971-1166
678-971-1168 (FAX)
SHANE@LAZLAWGROUP.COM          *ATTORNEY FOR PLAINTIFF*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1

The undersigned attests that this document was prepared in Times New Roman, 14-point font that complies with this Court's Rules.

This 22ND day of March, 2019.

**LAZENBY LAW GROUP, LLC**

*/s/ R. SHANE LAZENBY*

_____

R. SHANE LAZENBY
GEORGIA STATE BAR NUMBER 441670

P.O. BOX 2875
GAINESVILLE, GEORGIA 30503
678-971-1166
678-971-1168 (FAX)
SHANE@LAZLAWGROUP.COM          *ATTORNEY FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the PLAINTIFFS'

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL

FACTS with the Clerk of Court using the CM/ECF system and have served a copy

of the within and foregoing pleading to all parties to this matter via U.S. Mail, with

proper postage prepaid, addressed as follows:

Brent M. Estes
Dennis, Corry, Smith & Dixon, LLP
900 Circle 75 Parkway, Suite 1400
Atlanta, GA 30339

I FURTHER CERTIFY that the undersigned is in possession of the original

pleading referenced above.

This 22ND day of March, 2019.

**LAZENBY LAW GROUP, LLC**

*/S/* **R. SHANE LAZENBY**

_____

R. SHANE LAZENBY
GEORGIA STATE BAR NUMBER 441670

P.O. BOX 2875
GAINESVILLE, GEORGIA 30503
678-971-1166
678-971-1168 (FAX)
SHANE@LAZLAWGROUP.COM                    *ATTORNEY FOR PLAINTIFFS*