# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

PATRICIA HOLLAND, Surviving
Mother of KIP EUGENE HOLLAND,
and WAYNE HOLLAND, as
Administrator of the Estate of KIP
EUGENE HOLLAND, Deceased,

      Plaintiffs,

v.

CYPRESS INSURANCE COMPANY,
J.W. HARPER FARMS, and KERI
BELL, as Administrator of the Estate
of JAMES WENDELL HARPER,
Deceased,

      Defendants.

Civil Action No.

2:17-CV-120-RWS

## <u>ORDER</u>

This case comes before the Court on Defendants' post-trial Motion for Judgment Notwithstanding the Verdict or, in the Alternative, Motion for New Trial, and Motion for Oral Argument, as well as all related filings.  [Docs. 223, 226, 229, 230].  Having considered the record, the Court enters the following Order.[1]

---

[1] The Court deems oral argument unnecessary.  Accordingly, Defendants' Motion for Oral Argument [Doc. 230] is **DENIED**.

This wrongful death action proceeded to jury trial in February 2020. Following four days of evidence, the jury returned a verdict in favor of Plaintiffs on all issues. Specifically, the jury's verdict awarded Plaintiffs $13,000,000 for wrongful death, $2,000,000 for pain and suffering, and $29,363 for medical and funeral expenses. [Doc. 209]. The jury unanimously found that Defendant Cypress Insurance Company's ("Cypress") insured, the now deceased James Wendell Harper, engaged in bad faith in the transaction, pursuant to O.C.G.A. § 13-6-11, which provides for the expenses of litigation to be awarded as damages. In a bifurcated proceeding following the liability phase, and pursuant to § 13-6-11, the jury also rendered a special verdict in the amount of $6,000,000, for litigation expenses to be awarded to counsel for Plaintiffs. [Doc. 210]. Final Judgment was entered on both verdicts in the amount of $21,029,263. [Doc. 211].

## I.    Legal Standards

Defendants move for judgment notwithstanding the verdict pursuant to FED. R. CIV. P. 50 and, alternatively, for a new trial under FED. R. CIV. P. 59(a)(1)(A).

Analysis of Defendants' Motion for Judgment Notwithstanding the Verdict ("JNOV") is subject to the following standard:

> [T]he Court . . . consider[s] all of the evidence . . . in the light and with all reasonable inferences most favorable to the party opposed to the

2

motion.   If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.  On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[ ] should be denied. . . .

Rabun v. Kimberly-Clark Corp., 678 F.2d 1053, 1057 (11th Cir. 1982) (quoting King v. Exxon Co., U.S.A., 618 F.2d 1111, 1116 (5th Cir. 1980)); accord Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001) (citation omitted).

"In determining whether 'the facts and inferences point ... overwhelmingly in favor of one party,' the judge is not permitted to weigh the evidence . . . . Instead, [the judge] is obliged to make a prior, more basic determination of whether any credible evidence has been proffered by the non-moving party." Rabun, 678 F.2d at 1057 (internal citations omitted).  Thus, regarding sufficiency of the evidence, the Court considers "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached."  Id. (quoting C. Wright & A. Miller, 9 FEDERAL PRACTICE AND PROCEDURE – CIVIL at 545-46 (1981) (citation omitted)).

A new trial is appropriate under Rule 59 if the Court "believes the verdict rendered by the jury was contrary to the great - and not merely the greater - weight of the evidence." Minks v. Polaris Indus., Inc., 2007 WL 1452906, at **1–2 (M.D. Fla. May 15, 2007) (citation omitted), aff'd, 546 F.3d 1364 (Fed. Cir. 2008). The trial judge must independently weigh the evidence favoring the jury verdict against the evidence in favor of the moving party. Williams v. City of Valdosta, 689 F.2d 964, 973 n.7 (11th Cir. 1982) (citing Rabun, 678 F.2d at 1060). The existence of conflicting evidence is not enough, standing alone, to justify a new trial. See Spurlin v. Gen. Motors, Corp., 528 F.2d 612, 621 (5th Cir. 1976).

## II.    Discussion

Defendants' Motion asserts: 1) Direct action against Cypress is improper because Plaintiffs failed to prove Cypress filed a certificate of insurance with the appropriate state authority and because Mr. Harper was an interstate motor carrier; 2) Defendants are not liable because the accident was caused by an "act of God"; 3) Plaintiffs failed to prove bad faith in the transaction and thus are not entitled to attorney's fees under O.C.G.A. § 13-6-11; 4)  The amount of attorney's fees awarded is unreasonable and against the weight of the evidence; 5) The jury charge on actual pain and suffering was unsupported by any evidence; and 6) Plaintiffs' improper closing argument misled the jury as to a central issue in the case.

Defendants' Motion largely challenges jury determinations – factual findings or quintessential mixed questions of fact and law that are reserved for the jury.  For example, Defendants question the jury's determination as to liability based upon the negligence of Mr. Harper and the finding that Mr. Harper engaged in bad faith in the transaction; and, there was ample evidence presented at trial to support both.  Defendants contend that this Court should now disregard and set aside the jury's decision as a matter of law.  The judgment in this case is supported by the jury's verdict which the Court concludes is supported by the evidence in the case and is not contrary to a greater weight of evidence.

Moreover, at the conclusion of Plaintiffs' case-in-chief, Defendants advanced several of their legal arguments orally, and the motions were denied. Regarding these issues, the Court will rely heavily on the trial record.

The Court turns to Defendants' legal arguments.

**Applicability of Georgia's Direct Action Statute**

Plaintiffs named Cypress as a party pursuant to O.C.G.A. § 40–1–112, which permits a "direct action" against the insurer of a motor carrier by "establish[ing] an independent cause of action against the carrier's insurer on

behalf of a member of the public injured by the carrier's negligence."[2] <u>Jackson v. Sluder</u>, 569 S.E.2d 893, 895 (Ga. App. 2002); <u>accord</u> <u>Waldon v. ACE Am. Ins. Co.</u>, 2017 WL 3000040, at *4 (N.D. Ga. March 21, 2017) (citing O.C.G.A. § 40–1–112(c); O.C.G.A. § 40–2–140(d)(4)).

In order to invoke the direct action and add the carrier's insurer, "a plaintiff must establish the following elements: (1) the carrier is a 'motor carrier' as defined by the statutes; (2) the plaintiff has an actionable injury (i.e., liability coverage for this type of claim exists under the insurer's policy); and (3) the insurer is an 'insurance carrier' as defined by the statutes." <u>Waldon</u>, 2017 WL 3000040, at *3 (citation omitted); <u>see also</u> <u>McGill v. Am. Trucking & Transp., Ins. Co.</u>, 77 F. Supp. 3d 1261, 1265 (N.D. Ga. 2015).

Defendants challenge applicability of Georgia's direct action statute on two grounds: 1) Plaintiffs failed to establish an alleged essential element of their direct action claim by failing to offer evidence that Cypress filed a certificate of insurance with the State of Georgia; and 2) Mr. Harper was an interstate motor carrier (and not an intrastate motor carrier). Defendant unsuccessfully asserted

---

[2] The general rule is that claims cannot be brought by an injured plaintiff against the defendant's insurer because there is no privity of contract between the plaintiff and the insurer. <u>See</u> <u>Crisp v. Reg'l Hosp., Inc. v. Oliver</u>, 621 S.E.2d 554, 583 (Ga. Ct. App. 2006).

both legal arguments at trial, at which time the Court decided that the direct action against Defendant Cypress was proper.[3]  Defendants' legal arguments are not supported by Georgia law.

**Proof of Certificate of Insurance**

As noted in Plaintiffs' response, Defendants' memorandum of law does not discuss the first point – that Plaintiffs were required, as an element of their direct action claim against Cypress, to prove that Cypress filed a certificate of insurance with the State of Georgia.  [Doc. 226 at 8; Doc. 222-1 at 14-20].[4]  Instead, the only mention is in the factual recitation noting that, "Plaintiffs presented no evidence that [Mr.] Harper filed a certificate of insurance with the Georgia Department of Revenue, the Georgia Department of Public Safety, or with his base state in Alabama."  [Doc. 222-1 at 10].  Because Defendants' memorandum of law fails to fully develop this legal position, the Court finds that Defendants have abandoned the argument.  See generally Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324,

---

[3] Defendants moved for a directed verdict.  [Doc. 228-3, Trial Tr. at 11-20].  Defense counsel waited until Plaintiffs chose not to offer any rebuttal evidence and rested their case to argue that Plaintiffs allegedly failed to prove "an essential element" of the direct action suit against Cypress.

[4] The Court refers to the CM/ECF pagination when citing to the parties' filings and exhibits.  Similarly, for the sake of easily locating relevant portions of the trial transcript, the Court refers to the CM/ECF document number and corresponding pagination for each portion of the transcript.

1330 (11th Cir. 2004) (stating "well settled" appellate principle that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed").  As for the merits of the issue, the Court relies upon its bench ruling and recitation of the primary legal authorities in support.  [Doc. 206 - 2/6/20 Minute Entry – Oral Order Denying Defendants' Oral Motion for Directed Verdict Against Cypress; Doc. 228-4, Trial Transcript ("Tr.). at 3-4]. And see Waldon, 2017 WL 3000040, at *5; Jackson, 569 S.E.2d at 897.

### Alleged Intrastate Requirement

With respect to Defendant's argument that the direct action statute does not apply because Mr. Harper was an interstate motor carrier (and not an intrastate motor carrier), "federal courts have consistently held that the direct-action statutes apply to both interstate and intrastate carriers."  Mitchell v. Dixie Transp., Inc., 2019 WL 6137488, at *3 (N.D. Ga. November 19, 2019) (citing, *inter alia*, McGill v. Am. Trucking & Transp., Ins. Co., 77 F. Supp. 3d 1261, 1265 n.1 (N.D. Ga. 2015)); accord Bramlett v. Bajric, 2012 WL 4951213, at *2 (N.D. Ga. October 17, 2012)).  Bramlett spoke to the very argument Defendants raise here – by the same defense firm and counsel no less -- and construed the direct action statute to apply to *both* intrastate and interstate carriers.  2012 WL 4951213, at **2-3 (citations omitted).  Although Bramlett construed an earlier version of the statute, the court

considered the exact statutory language in rejecting the defense argument.[5]  Since

Chief Judge Thrash's decision in <u>Bramlett</u>, *supra*, and following the 2015

amendments to O.C.G.A. § 40-2-140 relied upon by Defendants, this argument has

been squarely rejected by courts in this district.  See, e.g., <u>Fordham v. Schneider

Nat'l Carriers, Inc.</u>, 2016 WL 9053345, at *3 (N.D. Ga. December 14, 2016); <u>and

see Scarff Bros., Inc. v. Bullseye Dispatch, Inc.</u>, 2016 WL 3128554, at *3 (N.D.

Ga. January 19, 2016) ("Courts have recognized [Section 40-2-140], and others

like it, to apply to both intrastate and interstate motor carriers." (citing cases));

<u>Cameron v. Teeberry Logistics</u>, 2013 WL 7874709 (N.D. Ga. May 21, 2013).

In short, Defendants' arguments concerning applicability of the direct action

statute are not well taken, and Defendants' Motion is denied as to this issue.

**Negligence Versus Act of God Defense**

Defendants asserted the affirmative defense that an act of God was the sole

proximate cause of the collision as opposed to Mr. Harper's negligence.

"[W]here the driver of an automobile suffers an unforeseeable illness which

causes him to suddenly lose consciousness and control of the automobile, the

driver's loss of control is not negligent, and he is not liable for any damages caused

---

[5] <u>Bramlett</u> analyzed the previous version's § 40-2-140(<u>c</u>)(4), which is identified in the 2015 amendment to the statute as a different subsection, § 40-2-140(<u>d</u>)(4).

by the out-of-control automobile." Lewis v. Smith, 517 S.E.2d 538, 540 (Ga. App. 1999); and see O.C.G.A. § 1–3–3(3) (defining "Act of God' as "an accident produced by physical causes which are irresistible or inevitable, such as . . . illness"). "[T]o establish an act of God defense based on illness producing a loss of consciousness, the driver must show that the loss of consciousness produced the accident without any contributing negligence on the part of the driver." Lewis, 517 S.E.2d at 540; accord Eatmon v. Weeks, 746 S.E.2d 886, 889 (Ga. App. 2013) (act of God defense barred negligence claim where driver suffered stroke at the wheel and no question of fact remained as to whether driver's loss of consciousness was reasonably foreseeable). It was Defendants' burden to establish the defense by a preponderance of the evidence. Lewis, 517 S.E.2d at 540 (citations omitted).

The evidence presented at trial through both eyewitness testimony and a video recording of the actual collision tended to show that Mr. Harper's truck was driving erratically for approximately one and a half to two miles before the truck left its lane of travel and traveled onto the shoulder of the road where Mr. Holland was walking.

The jury heard testimony from Plaintiffs' witness, Scott Carpenter, who was driving behind Mr. Harper's truck immediately before the collision. Mr. Carpenter testified that the truck "seemed to have a hard time maintaining lane[,]" was

making "jerky motions[,]" that he saw the truck leave the road, and that the truck was driving "erratically" for approximately one and a half to two miles prior to leaving its lane of travel and proceeding to the shoulder of the road where the collision occurred.  [Doc. 228-1, Trial Tr. 78-79].  Mr. Carpenter testified that he almost called 911 prior to the collision after observing the truck go into the oncoming lane of travel and cause another vehicle to leave the road.  [Doc. 228-1, Trial Tr. 78].  Evidence was also presented at trial that Mr. Harper's route took him by several locations where he could have potentially stopped the truck and gotten off the road.  [Doc. 228-2, Trial Tr. 79-89].  When Mr. Carpenter called 911 to report the collision, he reported that the truck had been "swerving way before that" and that the driver "may have had a medical emergency."  [Doc. 228-1, Trial Tr. 82-83].

Defendants argued to the jury that Mr. Harper experienced a sudden and unforeseeable illness causing him to become incapacitated and/or lose consciousness.   However, Defendants did not produce any medical expert or lay witness testimony in support, and Defendants' medical witnesses could not opine or affirmatively suppoert the theory notwithstanding evidence of Mr. Harper's documented medical conditions (i.e., history of throat cancer resulting in tracheostomy, smoker, hyperactive gag reflex, lung disease / chronic obstructive

pulmonary disorder, heart disease, history of brain aneurism, chronic cough, sleep apnea, etc.).  [Doc. 200, Exhibit 1 – Deposition of James Masdon, M.D. ("Dr. Masdon Dep.") at 18; Doc. 199, Exhibit 1 – Deposition of Joel Milligan, M.D. ("Dr. Milligan Dep.") at 64-65].  And Plaintiffs' theory was that Mr. Harper's health undermined Defendants' position that he suffered from an unforeseeable medical event.  The jury was tasked with considering and weighing the evidence and ultimately determined that Mr. Harper was negligent, implicitly rejecting the act of God defense.

Defendants' Motion fails to meet either legal standard for JNOV or a new trial and the Motion will be denied.

**Bad Faith in the Transaction**

Next, Defendants contest the jury's finding that Mr. Harper engaged in bad faith in the transaction, which provides for the expenses of litigation to be awarded as damages where specially pleaded and "where defendant has acted in bad faith . . . ."  O.C.G.A. § 13-6-11.  "Bad faith implies 'a dishonest purpose' and a 'conscious doing of wrong.'"  Bramlett, 2012 WL 4951213, at *8 (citation omitted).  Speaking to the nature of the § 13-6-11 bad faith inquiry, the Georgia Court of Appeals has held:

> Indicative of whether a party acts in good or bad faith in a given transaction is his abiding by or failing to comply with a public law made

for the benefit of the opposite party, or enacted for the protection of the
latter's legal rights.  Evidence that appellants failed to comply with
mandatory safety regulations promulgated for the benefit of appellees
is some evidence that appellants acted in bad faith in the transaction,
within the meaning of O.C.G.A. § 13-6-11.

Windermere, Ltd. v. Bettes, 179, 438 S.E.2d 406, 409 (Ga. App. 1993) (citations

and internal quotation marks omitted). Whether bad faith has occurred under

O.C.G.A. § 13–6–11 is a question for the jury.  Bramlett, 2012 WL 4951213, at *8

(citation omitted).

At trial, the jury heard evidence that Mr. Harper gave incomplete

information when participating in medical examinations for purposes of

commercial licensure through the Federal Motor Carrier Safety Administration

("FMCSA").  During Plaintiffs' case, Larry Johnston, M.D., testified about

specific inaccuracies in Mr. Harper's August 1, 2016 FMCSA medical

examination ("ME") history including the failure to disclose pharmaceutical usage,

namely, his prescriptions for hydrocodone.  Mr. Harper's 2013 and 2014 FMCSA

MEs revealed similar inaccurate responses.  Trina Glasgow, who worked in the

industry and contracted with Mr. Harper, testified that she would terminate any

driver who falsified a FMCSA medical history.  [Doc. 200, Exhibit 2 – Deposition

of Trina Glasgow ("Glasgow Dep.") at 41-42].

As previously discussed, the jury also heard from Scott Carpenter, who testified that Mr. Harper's truck was driving "erratically" for approximately one and a half to two miles prior to leaving its lane of travel and proceeding to the shoulder of the road where the collision occurred.  [Doc. 228-1, Trial Tr. 78-79]. Evidence was also presented at trial that Mr. Harper's route took him by several locations where he could have potentially stopped the truck and gotten off the road. [Doc. 228-2, Trial Tr. 79-89].

Plaintiffs also introduced evidence that Mr. Harper was having prescriptions for pain (including, hydrocodone) refilled automatically every 30 days and that there was a second prescription for a narcotic written by a different physician that was not disclosed on known pharmaceutical records.  [Dr. Milligan Dep. at 71-75]. In addition, Mr. Harper's recordings indicated that he had driven 9,000+ miles over the course of 16 days in the month preceding the accident.  This evidence supports a reasonable inference that Mr. Harper 1) may have been taking hydrocodone while working/driving; 2) may have been under the influence of hydrocodone at the time of the accident.  Defendants elicited competing evidence from Mr. Harper's daughter, Annette Bell, that Mr. Harper did not take his hydrocodone when driving.  Conflicting evidence is not a basis for setting aside the jury verdict.

Plaintiffs argued that Mr. Harper had an obligation to comply with FMCSA safety regulations such as the annual MEs and the rules of the road requiring a driver to stop driving and pull over if experiencing issues that could cause his driving to be unsafe.  The jury verdict could be supported by either (or both) of these theories.  See Meyer v. Trux Transp., Inc., 2006 WL 3246685, at *6 (N.D. Ga. November 8, 2006) (evidence defendant truck driver failed to comply with federal safety regulations promulgated for the benefit of plaintiff and other drivers and passengers on the road presents a question of fact as to whether defendant acted in bad faith in the transaction).  Critically, Plaintiffs' evidence tended to show that, at minimum, Mr. Harper misrepresented his medical condition repeatedly in order to continue to drive commercially as that was his livelihood.

Plaintiffs offered credible, probative evidence in support of the bad faith claim, which the Court finds legally sufficient.  As previously stated, whether Mr. Harper's conduct amounts to bad faith in the transaction under the statute is within the province of the jury.  Defendants' Motion is denied on this issue.

**Reasonableness of Attorney Fee Award**

Defendants also challenge the jury's special verdict awarding Plaintiffs' counsel $6,000,000, for litigation expenses pursuant to O.C.G.A. § 13-6-11 based upon the finding of bad faith.  [Doc. 210].  In doing so, the jury presumably elected

to enforce the contractual arrangement between Plaintiffs and Plaintiffs' counsel providing for a contingent fee of 40% of any recovery.

Under Georgia law, "[a] court may consider a contingent fee agreement . . . as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees[,]" provided the party shows "that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered." Brock Built, LLC v. Blake, 730 S.E.2d 180, 184-85 (Ga. App. 2012) (citation omitted).

To support the claim for statutory litigation expenses, Plaintiffs introduced into evidence a copy of their contingency fee contract, an accounting of time spent on the case by counsel, and live testimony from another local practitioner who specializes in personal injury and wrongful death actions, Attorney Matthew Cook ("Mr. Cook").   [Doc. 228-4, Trial Tr. at 76-102].  Mr. Cook's testimony was both thorough and credible.  Mr. Cook testified that this sort of contingency fee arrangement and percentage of total award in this case was both customary and standard.  [Doc. 228-4, Trial Tr. at 91-93].  Mr. Cook explained that wrongful death cases in particular require plaintiffs' counsel to undertake significant risk in the investment of time and resources, and that, in exchange for a willingness to

undertake this risk, a percentage of the recovery (i.e., contingency fee) is a way to reflect the risk and compensate the plaintiff's attorney.  [Doc. 228-4, Trial Tr. at 92-93].  In explaining his professional opinion that Mr. Cook's fee was, in fact, reasonable, Mr. Cook spoke to each of the familiar "lodestar factors."  [Doc. 228-4, Trial Tr. at 94-99].  Mr. Cook also testified that the actual expenses incurred by counsel on Plaintiffs' behalf were reasonable and customary, if not low for this kind of case.  [Doc. 228-4, Trial Tr. at 93].

Defendants did not present any rebuttal evidence.

The jury was instructed on expert testimony and explicitly advised that they did not have to accept Mr. Cook's expert testimony in arriving at their verdict. [Doc. 228-4, Trial Tr. at 104-105].  The jury was instructed simply:

> Based upon your finding of bad faith on the part of Defendant James Harper, the plaintiffs are entitled to recover their reasonable expenses of litigation.  The plaintiffs must prove by a preponderance of the evidence the actual cost of plaintiffs' attorney's fees and the reasonableness of those costs.
>
> A contingency fee agreement is a guidepost to the reasonable value of the services the lawyer performed.  However, you are not bound to that fee in your deliberations.  In addition to attorney's fees, plaintiffs may recover other costs reasonably incurred in the case.

[Doc. 228-4, Trial Tr. at 105].  And see Eways v. Georgia R.R. Bank, 806 F.2d 991, 992 (11th Cir. 1986) (citing First Bank of Clayton County v. Dollar, 285 S.E.2d 203, 205 (Ga. App. 1981); Davis v. Fomon, 240 S.E.2d 581, 581 (Ga. App. 1977)).

The jury unanimously found that the contingency fee agreement entered into between the parties and an attorney's fee equaling 40% of the recovery was reasonable.  The jury's verdict was supported by evidence it deemed credible. LaRoche Indus., Inc. v. AIG Risk Mgmt., Inc., 959 F.2d 189, 193 (11th Cir. 1992) (question of attorneys' fees is "within the province of the jury" and should not be vacated "unless there was absolutely no evidence to support it").

Defendants' contention that Plaintiffs were required to provide evidence of an hourly rate to support their request for attorney's fees does not comport with the Court's reading of the governing law.  [Doc. 229 at 13-14].  According to Defendants, the contingency fee contract *must* be supported by evidence of counsel's hourly rate for professional services in order to be found reasonable. Defendants rely on Georgia Dep't of Corrections v. Couch, which provides:

> Evidence of the existence of a contingent fee contract, without more, is not sufficient to support the award of attorney fees.  An attorney cannot recover for professional services without proof of the value of those services.  A naked assertion that the fees are "reasonable," without any evidence of hours, rates, or other indication of the value of the professional services actually rendered is inadequate.

759 S.E.2d 804, 815–16 (Ga. 2014) (citation omitted).  The pertinent language is written in the disjunctive as opposed to conjunctive and requires "evidence of hours, rates, *or* other indication of the value of the professional services actually rendered."  Id.  Under Georgia law, Plaintiffs were required to proffer more than

the contingency fee agreement itself.  Plaintiffs introduced Mr. Cook's live testimony to speak to the value of the professional services counsel rendered and were not required to introduce evidence of an hourly rate.  There is also no requirement under § 13-6-11 that Plaintiffs establish proportionality between attorney's fees and compensatory damages.  See e.g., GT Software, Inc. v. webMethods, Inc., 465 Fed. Appx. 844, 847 (11th Cir. 2012) (citing Tyler v. Lincoln, 272 Ga. 118 (2000) (upholding attorney's fee award for bad faith in transaction when jury awarded only nominal damages to plaintiff)); and see Spring Lake Prop. Owners Ass'n, Inc. v. Peacock, 390 S.E.2d 31, 32 (Ga. 1990) (same).

Defendants' Motion is denied.

**Jury Instruction on Pain and Suffering**

Defendants next contend that the jury charge on actual pain and suffering was not supported by evidence.  Defendants raised this issue at the close of the evidence and argued that the evidence did not support an instruction on pain and suffering.  At the same time, Defense counsel conceded that Plaintiff "has a claim for pre-impact shock and fright."  [Doc. 228-2, Trial Tr. at 104].  The Court took the matter under advisement and subsequently denied Defendants' motion.  [Doc. 228-2, Trial Tr. at 104-105; Doc. 228-3, Trial Tr. at 10-11].

Georgia law provides for pain and suffering that occurs pre-impact and post-impact.  Lewis v. D. Hays Trucking, Inc., 701 F. Supp. 2d 1300, 1313-15 (N.D. Ga. 2010) (discussing cases).  In other words, the jury may consider whether damages should be awarded to Plaintiffs for pain and suffering that may have occurred both before and after the collision that ended Mr. Holland's life.  Specifically, "for pre-impact pain and suffering to be awarded, the jury must have some evidence that the deceased at some point in time was conscious of [his] imminent death; the jury may infer such consciousness from evidence immediately prior to impact or following injury."  Id. at 1314; accord Monk v. Dial, 441 S.E.2d 857, 859 (Ga. 1994).

During trial, the jury saw a video depicting Mr. Holland walking along the shoulder of the road and appear to look towards the truck/tractor trailer driven by Mr. Harper as it proceeded directly into his path.  [Plaintiffs' Trial Exhibit 1].  The video graphically depicts the trailer detaching from the cab and beginning to swing towards Mr. Holland, at which point the video does not show Mr. Holland's face.  [Plaintiffs' Trial Exhibit 1].  Plaintiffs also introduced evidence that, after the collision, the first people on the scene, and even the emergency personnel who responded, were unaware that Mr. Holland had been hit by trailer.  As a result, Mr. Holland was unattended for a period of time.  The first person to observe Mr.

Holland was Lew Anne (or "Chris") MacArthur, who testified that Mr. Holland was lying face-down in the ground behind the trailer, that "he did not appear to be conscious" but that she heard him moan "once," and could not tell if he was still alive. [Doc. 228-1, Trial Tr. at 89-91]. According to Ms. MacArthur, she observed activity on the opposite side of the road where the cab of Mr. Harper's truck had stopped (activity she later learned were people attending to Mr. Harper), and she testified that the people across the road apparently did not realize that Mr. Holland had been hit. [Doc. 228-1, Trial Tr. at 91]. On cross-examination Ms. MacArthur testified that Mr. Holland was not responsive to questions, that she did not see any movement, and she restated that she could not tell if Mr. Holland was still alive. [Doc. 228-1, Trial Tr. at 96-97].

The Court's instructions on pain and suffering read:

> Pain and suffering is a legal item of damages. The measure is the enlightened conscience of fair and impartial jurors. Questions of whether, how much, and how long plaintiffs' decedent suffered are for you to decide. Pain and suffering includes mental suffering. In evaluating Kip Holland's pain and suffering, you may consider the following factors, if proven: fear, fright, shock of impact, actual pain and suffering, and mental anguish. There's no requirement that physical injury precede mental pain and suffering.

[Doc. 228-2, Trial Tr. at 353].

As illustrated by Lewis and Monk, the Court's instruction as to pre-impact shock and fright was consistent with Georgia law. In Lewis, the undisputed

21

evidence of record was that the plaintiff's car was struck by the tractor-trailer and

Ms. Lewis, the decedent, died instantaneously.  701 F. Supp. 2d at 1313-15.  The

court cited to testimony from first responders that there were no signs of life when

they arrived on the scene and there was no evidence of any action Ms. Lewis may

have taken after the accident which would indicate her survival for any period of

time.  Id. at 1315.  At summary judgment, the court held that the jury could

consider awarding plaintiff's estate's damages for conscious pain and suffering

based solely on the evidence that plaintiff could have been aware of the impending

collision and "deadly peril."  Id.  The court cited to evidence showing that "the

dark night was clear, the stretch of road was straight, and [defendant] had his low

beams on. . . . [and held that a] jury could infer from these circumstances that Ms.

Lewis understood the tractor trailer was bearing down on her and was not going to

stop."  Id.

In Monk, another wrongful death action, the Georgia Court of Appeals

rejected the argument that an award of pain and suffering was improper given

undisputed evidence establishing instantaneous death of the decedent.  The court

explained why the evidence could sustain the jury's pain and suffering award:

> The decedent's pickup truck was traveling at great speed when it
> collided with the tractor-trailer and there was no movement or sign of
> life after the collision.  Nonetheless, from evidence that the decedent's
> vehicle veered shortly before the collision, the jury could infer that

decedent was aware of the impending crash, and from these
circumstances could extrapolate the probable mental state of decedent
in that last moment of consciousness.  The fright, shock, and mental
suffering experienced by an individual due to wrongful acts of
negligence will authorize a recovery where attended with physical
injury. . . .  Contrary to defendants' assertion, we find no requirement
that the physical injury precede the mental pain and suffering.

Monk, 441 S.E.2d at 859 (internal citations omitted).  During trial, the jury saw a

video recording of the actual collision, including Mr. Holland looking in the

direction of the tractor trailer as it headed in his direction.  [Plaintiffs' Trial Exhibit

1].  Plaintiffs' counsel argued that the video showed Mr. Holland's appreciation of

the imminent collision.  The Court's instruction that pain and suffering may

include mental suffering and that the jury could consider factors such as fear,

fright, or shock of impact was proper.

Likewise, the jury was properly instructed that, *if proven*, they could

consider "actual pain and suffering."  Defendants contend that the jury's pain and

suffering award was based on impermissible speculation because Plaintiffs did not

introduce any medical evidence establishing that Mr. Holland remained alive for a

period of time after the collision and did not introduce expert testimony that Mr.

Holland's moan was a conscious act or that he was capable of experiencing pain

following the accident.  [Doc. 229 at 16].  Defendants have not identified any

Georgia case holding that medical testimony is required in order to create a triable issue on pain and suffering.[6]

In their reply, Defendants point the Court to Grant v. Georgia Pacific Corp., 521 S.E.2d 868, 871 (Ga. App. 1999), and Curtis v. United States, 274 F. Supp. 3d 1366, 1380 (N.D. Ga. 2017).  Defendants cite Grant for the proposition that, where "there is no evidence the decedent exhibited consciousness of pain, recovery for the decedent's pain and suffering is not permitted."  Grant, 521 S.E.2d at 871 (citations omitted).  However, in Grant, which did not involve an imminent collision, medical evidence revealed that "the decedent had 'severe coronary artery disease,' and suffered a fatal heart attack[,]" and a pathologist testified that, "[d]eath was instantaneous. . . .  [The decedent] just dropped dead."  Id. at 869; see also Lewis, 701 F. Supp. 2d at 1314 (distinguishing Grant).  Here, unlike the facts in Grant, there was no medical evidence introduced at trial establishing that Mr. Holland's death was (or was not) instantaneous.  Furthermore, as discussed supra,

---

[6] To the extent Defendants fault Plaintiffs for failing to proffer medical expert testimony to show that Mr. Holland's moan was evidence of life, i.e., evidence that Mr. Holland was, in fact, experiencing pain and suffering, Defendants failed to offer medical expert testimony in rebuttal that a single moan or groan was not indicative that Mr. Holland was still alive and capable of experiencing pain and suffering.

this jury saw video evidence that could reasonably support a finding of pre-impact fright and shock – a point conceded by Defendants.  Therefore, <u>Grant</u> is inapposite.

The wrongful death action in <u>Curtis</u> involved a plane crash and was decided via bench trial.  Judge Batten, *acting as the factfinder*, determined that the decedent did not suffer after the plane crash and never regained consciousness after impact.  <u>Curtis</u>, 274 F. Supp. 3d at 1374-76.  The evidence showed that decedent had a pulse when discovered, that his eyes remained closed, that his leg moved once, that he sat up and coughed blood, and there was no evidence that decedent moaned, screamed, or cried out at any time despite being moved for transport to the hospital where he died two and a half hours later.  <u>Id.</u>  In support of this finding, the court noted the absence of evidence of consciousness between the time of the crash and when medical personnel arrived.  <u>Id.</u> at 1375.  The court also based its finding on the testimony of medical personnel that decedent was unresponsive and appeared unconscious throughout, including testimony from one of the treating paramedics that the movements observed were like a "sympathetic nervous system reflex" or a sign that the body was in distress; that the paramedic did not believe decedent exhibited "any level of consciousness."  <u>Id.</u> at 1376 n.11.  The court found as a factual matter that the decedent's movements were "consistent with the capabilities of an unconscious person."  <u>Id.</u> at 1375-76.  As a

result, the court held that the decedent's estate could not recover for post-impact pain and suffering but would be limited to any recovery based on pre-impact pain and suffering.  Id. at 1380 (citation omitted).[7]

While Curtis may be instructive generally, it does not compel the result Defendants seek in this case.  Judge Batten, acting as factfinder, relied on testimony from an attending paramedic that the decedent's movements were not indicative of consciousness.  Id. at 1376 n.11.  Here, there is no such evidence, and the jury was the trier of fact.  As previously mentioned, the instruction to the jury made clear that "[q]uestions of whether, how much, and how long plaintiffs' decedent suffered are for [the jurors] to decide."  [Doc. 228-2, Trial Tr. at 353]. Equally important, in acknowledging that the experienced pilot-decedent would have appreciated, within a span of three to four seconds, that something was amiss with the plane and attempted landing and that the crash would likely result in either serious injury or death, Curtis supports Plaintiffs' position concerning pre-impact pain and suffering damages.  Curtis, 274 F. Supp. 3d at 1380 (applying Monk).

In conclusion, the jury charge on pain and suffering was based on the video recording of the collision, undisputed evidence that Mr. Holland was unattended

---

[7] Notably, in so ruling, the court cited to Walker v. Daniels, 407 S.E.2d 70, 75–76 (Ga. App. 1991) (holding that questions of consciousness, as required for award of damages for pain and suffering, are a matter for the trier of fact to decide).  Id.

for some period of time immediately following the accident, and credible

testimony from Ms. MacArthur that she heard Kip Holland moan at least once after

she discovered him lying face down behind the tractor trailer.  To the extent the

jury's pain and suffering award could not be sustained based solely on a finding of

pre-impact shock and fright, the Court deems Ms. MacArthur's testimony a legally

sufficient basis to allow the jury to consider whether Mr. Holland remained

conscious for a period of time, and whether or not he may have endured pain and

suffering after the collision.  This was proper evidence for the jury to weigh and

could reasonably support the jury's damage award for pain and suffering.[8]

Defendants' Motion is denied as to this issue.

### Jury Argument

Finally, Defendants argue that Plaintiffs' counsel's closing argument was

improper.  Defendants challenge two of counsel's statements.  More specifically,

Defendants first complain that counsel misstated the law by stating:

---

[8] Defendants also appear to argue that the Court should have provided the jury a special interrogatory on the verdict form requiring the jury to specify if their pain and suffering award was based on pre-impact or post-impact evidence, or both.  Defendants did not make that request at trial.  Defendants requested that the verdict form specify what portion of their damages award was attributed to "conscious pain and suffering" and the Court honored that request by adding a separate question to the verdict form for pain and suffering damages.  [Doc. 229-4, Trial Tr. at 8-9].

> So I want you to listen closely when the judge gives you instructions.
> Our burden is met.  All we have to do is tilt the scale.  Did Mr. Harper
> leave his lane of travel?   Did Mr. Harper kill Kip Holland?

[Doc. 228-4, Trial Tr. at 48].  Defense counsel objected.  The Court followed the

defense objection by telling the jury, "The Court will instruct the jury on the law

and you will follow my instructions."  [Doc. 228-4, Trial Tr. at 48].  Indeed, the

Court's final jury charge detailed the claims, defenses asserted, and the parties'

respective burdens of proof.  [Doc. 215].  The Court also explicitly instructed the

jury in preliminary instructions that jury arguments made by counsel and counsel's

remarks are not evidence.  [Doc. 228-1, Trial Tr. at 26].[9]

The Court presumes that the jury complied and followed the Court's

instructions as opposed to counsel's remark.  Therefore, even if counsel's remark

could be construed as a misstatement of the law, and/or prejudicial, the Court's

curative instruction, which immediately followed, remedied any prejudice or taint.

See Wiedeman v. Canal Ins. Co., 770 Fed. Appx. 497, 500 (11th Cir. 2019) ("[a]

---

[9] The preliminary instruction reads in pertinent part:

> The evidence from which you will find the facts will consist of the
> testimony of witnesses, documents and exhibits received into evidence. . . .
> **Certain things are not evidence and must not be considered by you
> during your deliberations.  These include the opening statements or
> closing arguments by the attorneys**.

[Doc. 228-1, Trial Tr. at 26].

curative instruction purges the taint of a prejudicial remark because a jury is presumed to follow jury instructions").

Defendants' second argument is that Plaintiffs' counsel erred by commenting on Plaintiffs' inability to examine Mr. Harper. Defendants contend that counsel's comment was "extraordinarily prejudicial" because it unfairly suggested that Mr. Harper had something to hide. [Doc. 229 at 19].

As an initial matter, Defendants' counsel remarked during opening statements that it was regrettable that Mr. Harper could not share his side of the story and explain what happened on the day of the incident. [Doc. 228-1, Trial Tr. at 48-49, 54]. More specifically, defense counsel acknowledged that Mr. Harper died from causes unrelated to the accident at the age of 77 before he could testify about what happened. According to Plaintiffs, defense counsel's remarks opened the door to Mr. Harper's unavailability as a witness and the impact of his unavailability to both sides. [Doc. 226 at 24-25]. The Court agrees that Defendants introduced Mr. Harper's unavailability and unfortunate passing to the jury, thereby, permitting Plaintiffs to address it. Significantly, neither side introduced evidence of the circumstances surrounding Mr. Harper's death or suspected cause of death – only that Mr. Harper passed away before he could testify about the events of December 8, 2016. If Plaintiffs' counsel speculated on

matters not in evidence, Defendants' counsel committed the same offense.  The

Court has broad discretion with respect to counsel's closing arguments.  See

Carroll v. ATA Retail Services, Inc., 2017 WL 11113320, at *9 (N.D. Ga. July 25,

2017).  The Court does not interpret Plaintiffs' counsel's remark as necessarily out

of bounds and finds that, to the extent this was error, the error was not

extraordinary or so prejudicial that it warrants setting aside the judgment imposed

or a new trial.  See Neal v. Toyota Motor Corp., 823 F. Supp. 939, 944 (N.D. Ga.

1993) (citing Bankatlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467,

1474 (11th Cir. 1992)).

## III.    Conclusion

It is hereby **ORDERED** that Defendants' Motion for Judgment

Notwithstanding the Verdict, or in the Alternative, Motion for New Trial [Doc.

223] is **DENIED.**  It is further **ORDERED** that Defendants' Motion for Oral

Argument [Doc. 230] is likewise **DENIED.**

**SO ORDERED** this 21st day of August, 2020.

_____

**RICHARD W. STORY**
United States District Judge

30